RICHARD A. CADY AND SYLVIA H. CADY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cady v. Commissioner
Docket No. 21327-86
United States Tax Court
T.C. Memo 1990-474; 1990 Tax Ct. Memo LEXIS 518; 60 T.C.M. (CCH) 670; T.C.M. (RIA) 90474; August 30, 1990, Filed *518 Decision will be entered under Rule 155. *519 Richard A. Cady, pro se. Susan S. Canavello, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in and additions to petitioners' joint Federal income tax for calendar year ending December 31, 1982, as *520 follows: Additions to Tax
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
$ 42,487.00
$ 2,124.40
*
$ 1,757.00
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for taxable year 1982. All Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by both parties, the issues for decisions are: 1. Whether petitioners understated their net income from Marine Press. In order to decide this, we must determine (A) whether Marine Press' cost of goods sold deduction was understated by $ 1,580; and (B) whether Marine Press' business deductions, per the original return, were overstated by $ 12,979. 2. Whether petitioner Richard A. Cady's share of undistributed taxable income from Cady Co. is $ 59,390. In order to decide this, we must determine (A) whether petitioner Richard A. Cady owned 100 percent of Cady Co.; (B) whether *521 Cady Co.'s business activities included Bahamas Caribbean International (BCI), a travel agency, and P.I.L.O.T. Publications (P.I.L.O.T.), a book publishing and distributing operation; and if so (C) whether Cady Co. realized an ordinary gain of $ 44,356 from the sale of a Lance Piper airplane; (D) whether Cady Co. underreported its gross receipts by $ 29,699.96, and (E) whether Cady Co. overstated its business deductions by $ 40,877.24. 3. Whether petitioners are liable for self-employment tax, and additions to tax under section 6661, and section 6653(a)(1) and (2). The medical expense and sales tax deductions which petitioners are allowed will be automatically adjusted based upon this Court's determination of their adjusted gross income. Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the attached exhibits, are incorporated herein. Petitioners resided in Mobile, Ala., at the time they filed their petition in this Court. Petitioners timely filed their 1982 joint individual Federal income tax return reporting a $ 9,181 net loss from Marine Press, and a $ 23,328 net loss from Cady Co. In November 1984 an audit *522 was commenced of Cady Co.'s 1982 corporate return. On December 31, 1984, petitioner Richard A. Cady filed an amended corporate return on behalf of Cady Co., and on January 4, 1985, petitioners filed an amended individual return for taxable year 1982 reporting a $ 3 net profit from Marine Press, [1] and a $ 6,178 net loss from Cady Co. In January 1985 an audit was commenced of petitioners' individual Federal income tax return for 1982 as originally filed. Pursuant to that audit respondent issued the statutory notice of deficiency in issue. Unless otherwise indicated, all references to petitioner refer to Richard A. Cady. For convenience we will *523 combine our findings of fact and opinion. The issues will be discussed seriatim. Marine Press
1. Understatement of Marine Press' net income
From 1968 through and after 1982 petitioner operated Marine Press, a sole proprietorship, whose principal business activity was writing, copyrighting, publishing, selling, and distributing books concerning marine surveying, salvage, and towing. Petitioner, a marine engineer, also engaged in the activity of marine consulting, and reported the income earned therefrom on his Schedule C. A. Cost of goods sold
From 1976 through 1981 petitioner expended approximately $ 21,564 purchasing materials and supplies consumed in his book publishing activity. During that same period petitioner deducted on his Schedules C approximately $ 15,104 as cost of goods sold. On his Schedule C for 1982 petitioner reported cost of goods sold of $ 2,530. Petitioner alleges, pursuant to his amended Schedule C, that cost of goods sold was $ 5,246, rather than $ 2,530. Respondent contend that cost of goods sold was $ 4,110. We disagree with both parties and find $ 4,790 [2] as the cost of goods sold. *524 B. Schedule C expenses
Petitioner alleges that Marine Press incurred business expenses of $ 12,979, which respondent incorrectly disallowed. Additionally, he alleges, per his amended Schedule C, a $ 3,000 increase in deductible expenses, i.e., $ 2,000 for insurance and $ 1,000 for repairs. Respondent allowed business deductions of $ 4,340. [3] He disallowed $ 13,752 of the deductions claimed on the original return on the grounds that the expenses were (1) not adequately substantiated, and/or (2) personal, rather than business. Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioners bear the burden of proving their entitlement to the deductions claimed. *525 Rule 142(a). Section 162(a) allows a deduction of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. A taxpayer's entitlement to these deductions is predicated on his ability to substantiate the amounts actually spent, and that they were directly connected with or pertain to the trade or business. Sec. 274(d); sec. 1.162-1(a), Income Tax Regs. See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). 1. Rent
On or around September 8, 1976, petitioners purchased a residence at 2301 Leroy Stevens Road, Mobile, Ala., from Cady Co. The contract sales price, as stated in the "Disclosure/Settlement Statement," was $ 65,000. Marine Press was operated out of the residence, and occupied approximately one-third of its total area. Although Marine Press never actually paid rent to petitioners, petitioner claimed a total of $ 12,300 in rental expense deductions on his Schedules C from 1978 through 1981, and deducted $ 3,600 *526 on his Schedule C for 1982. Respondent determined that (1) petitioners were entitled to claim depreciation on one-third of their residence, in lieu of deducting rent (see sec. 280A); (2) petitioners' basis was $ 50,000, of which $ 16,667 was subject to the allowance of depreciation, and (3) from 1977 through 1981 petitioners took and were allowed $ 16,800 in rent deductions. Accordingly, respondent did not allow petitioner a depreciation deduction in 1982. Petitioner testified he paid $ 50,000 to his son, Dale d/b/a Cady Co., as partial payment for the house before it was completed, and when the house was completed he paid an additional $ 65,000, as indicated in the settlement statement. He also claimed one-half of the house was used exclusively for business purposes. Petitioners have not convincingly shown they paid $ 105,000 for their house, or that more than one-third of it was used exclusively for business purposes. They introduced no checks or other corroborating evidence that the cost of the total property exceeded $ 65,000. Moreover, at the time of closing, the dwelling was insured for only $ 55,000 and the appurtenant structures for $ 5,500. We do not believe petitioners *527 would insure a house for $ 60,500 if they paid $ 105,000. Thus, we conclude that the property cost $ 65,000. However, we allocate $ 60,500 to the basis of the improvements, as evidenced by the 1976 insurance policy, rather than $ 50,000. We do not agree with respondent that petitioners took $ 16,800 worth of rent deductions between 1977 through 1981. On the 1978 Schedule C petitioner claimed a $ 1,500 deduction, not $ 3,000 as respondent contends. Although the 1977 return is not in evidence, we believe petitioner deducted $ 1,500 in 1977 as well. Accordingly, we conclude petitioner deducted approximately $ 13,800 between 1977 and 1981. Thus, the depreciable basis remaining is $ 6,366.67, i.e., $ 20,166.67 minus $ 13,800. The amount allowable as a depreciation deduction must be calculated under Rule 155. 2. Automobile expenses
Respondent disallowed all automobile expense deductions for lack of substantiation. When a taxpayer uses an automobile for personal and business purposes, only that percentage of the total expenses which represents business use is deductible. See *528 Cobb v. Commissioner, 77 T.C. 1096, 1101-1102 (1981). Petitioner used a 1977 Pontiac owned by Sylvia Cady and a 1977 El Camino owned by Cady Co. partly for business purposes, but failed to maintain records that allow us to determine with specificity the percentage of business vs. personal use. He did, however, keep gasoline charge receipts totaling $ 1,358.92, $ 1,276.62 of which were paid in 1982. The operating expenses attributable to the Pontiac and El Camino totaled $ 1,220.47, of which approximately $ 767.36 was incurred locally. Deductions claimed for local travel are not subject to the strict substantiation requirements of section 274(d), sec. 1.274-5(a)(1), Income Tax Regs. Using our best judgment, we conclude petitioner is entitled to deduct $ 306.94 for local travel. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930); Gestrich v. Commissioner, 74 T.C. 525, 531 (1980). Petitioner failed to sufficiently substantiate the business purpose of a trip to Florida in a Ford rental car. Moreover, the *529 other expenses claimed for maintaining the vehicles are not deductible, since petitioner failed to substantiate the percentage of business use. Additionally, petitioner substantiated to our satisfaction the amount, time, and business purposes of trips to Washington, D.C., and Milwaukee, Wis. See 274(d). Although petitioner Sylvia Cady accompanied petitioner on these trips, petitioner's purpose for taking the trips was primarily to research information for his books. Sec. 1.162-2(b)(1) and (2), Income Tax Regs. Sylvia's presence did not increase his automobile expenses. Accordingly, he is entitled to deduct those expenses, i.e., $ 308.70. 3. Freight expenses
On his Schedule C petitioner deducted $ 2,397 for UPS and postal expenses incurred to mail books to clients and other purchasers. Respondent allowed $ 295. At trial petitioner substantiated an additional $ 1,107.40 of shipping expenses, incurred for business purposes. Accordingly, petitioners are entitled to deduct an additional $ 1,107.40. 4. Insurance expenses
Respondent disallowed all insurance expense deductions for lack of substantiation. a. Airplane
During 1982 Dale Cady, petitioners' son, *530 flew petitioner, on behalf of Marine Press, to business meetings using Cady Co.'s airplane. Petitioner did not pay Cady Co. or Dale for these flights. Since Cady Co. could not afford insurance on the Cessna 414, petitioner paid $ 2,200 out of Marine Press' account for the insurance. Petitioner did not deduct the $ 2,200 payment, and respondent treated it as either a gift or a loan from petitioner to Dale. Petitioner now alleges he is entitled to deduct the payment. Petitioner did not establish how often he used the Cessna airplane on Marine Press' business or the value of that use. Therefore, we will not characterize any portion of the $ 2,200 as a business expense of Marine Press. Moreover, the record, as discussed later, indicates that Cady Co., rather than Dale individually, owned the Cessna until early 1983. Accordingly, the $ 2,200 insurance petitioner paid on the Cessna 414 is more properly characterized as a capital contribution to Cady Co., rather than a deductible expense to Marine Press. See Deputy v. du Pont, 308 U.S. 488 (1940). b. Residence
During 1982 Marine Press paid and deducted approximately $ 200 for insurance on petitioners' *531 residence. The only evidence petitioner presented substantiating the amount of insurance was a 1976-1977 premium notice for $ 397. Since we believe petitioner continued to carry insurance on his residence, and since it was probably more expensive in 1982 than in 1976, we will allow petitioner to deduct one-third of $ 397, or $ 132 in connection with the business use of his home. c. Automobile
During 1982 petitioner paid and deducted $ 313 on his Schedule C for auto insurance on the Pontiac and a license. However, petitioner failed to prove the percentage of the Pontiac's business use. Accordingly, the deduction is disallowed. 5. Office supplies
The business records of Marine Press show that during 1982 $ 193.47 in business checks were written, and $ 366.25 from petty cash was used to purchase office supplies. Petitioner deducted $ 604 on his Schedule C, $ 193 of which respondent allowed. Petitioner failed to properly substantiate that the $ 366.25 taken from petty cash was used to purchase office supplies. He had no receipts, except those hand written by him, verifying that any amount over the amount respondent allowed was expended for business purposes. We *532 are not required to blindly accept petitioner's testimony, or the documents on this issue. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Accordingly, we hold for respondent on this adjustment. 6. Repairs
Petitioner deducted $ 1,545 on his Schedule C for repairs to his residence, personal property, and business property. Petitioner substantiated to respondent that he expended $ 2,652.11 during 1982 for repairs. Respondent determined that $ 74.12 of the expenses were personal, $ 166.14 were attributable to Cady Co., and petitioners were entitled to a $ 789 deduction. Petitioners have not established entitlement to an amount greater than respondent determined. Accordingly, we hold for respondent on this adjustment. Additionally, we find that the $ 166.14 paid on behalf of Cady Co. is a contribution to capital to Cady Co. See Deputy v. du Pont, supra.
7. Travel and entertainment
Petitioner's consulting and book publishing activities required him to travel to various cities within and without the continental United States, including New York City and Amsterdam. The records of Marine Press show that during 1982, $ 4,758.89 *533 in business checks were written, and $ 56.50 from petty cash was used to pay travel expenses. Petitioner deducted $ 4,805 on his Schedule C. Respondent allowed $ 2,149. Although travel expenses are deductible under section 162, section 274 provides that no deduction is allowable unless the taxpayer establishes for each item o travel expenses (including meals and lodging incidental to such travel) the amount, time, place, and business purpose. See sec. 1.274-5(b)(2), Income Tax Regs.
Petitioner substantiated to our satisfaction the time, place, and business purpose of $ 578 in additional expenses. Additionally, petitioner is entitled to deduct $ 306.05 in lodging expenses incurred on his trip to Milwaukee, Wis., and Washington, D.C. Furthermore, $ 90 of the amount respondent allowed as a travel/entertainment expense, we reclassify and allow as an advertising expense. 8. Utilities and telephone
During 1982 petitioners paid $ 1,664.92 in utility expenses and $ 757.46 in telephone expenses. Petitioner deducted $ 783.53 of the utility, and $ 637.46 of *534 the telephone expenses on his Schedule C. Respondent allowed $ 555 of the utility expenses, and none of the telephone expenses. Since we agree with respondent that only one-third of the residence was used for business purpose, and since petitioner failed to present any evidence establishing the business use of the telephone, we hold for respondent on these adjustments. 9. Miscellaneous
Petitioner failed to prove the business purpose for any expenses not allowed by respondent. Accordingly, we hold for respondent on this adjustment. However, $ 89 of the amount respondent allowed as a miscellaneous expense, we reclassify and allow as an advertising expense. Cady Co.
2. Petitioner's share of undistributed taxable income
Respondent determined that Cady Co. had gross receipts of $ 101,363.81, cost of goods sold of $ 12,926.00, gross rents of $ 13,200, expenses of $ 86,604.06, and a $ 44,356.00 gain from the sale of the Lance Piper; and thus petitioner's share of Cady Co.'s taxable income was $ 59,390 ($ 15,034 exclusive of the gain from the sale of the airplane). These determinations were based on respondent's assumption that petitioner owned 100 percent of *535 Cady. Co. in 1982. Petitioner's ownership interest in Cady Co., and Cady Co.'s business activities
Cady Co. was incorporated on June 27, 1973, by petitioner and his sons, Dale and James Cady, to engage in the business of "Real Estate Development." James Cady left Cady Co. in 1974, and petitioner acquired his shares. In or around early 1978 Cady Co. ceased building houses. Cady Co. built and owned 10 houses by 1978. However, it was not able to sell them due to a slow real estate market. In 1978 The First National Bank in Mobile, Ala., which held the outstanding construction loans on those houses, threatened to foreclose if they were not sold. To help avoid bankruptcy, petitioner and Dale agreed that Dale would purchase one of the houses, allow Cady Co. to use a portion thereof as a suboffice, and rent the Cottage Hill Road office building, out of which Cady Co. had been operating, to a third party. Additionally, they agreed (1) to advance Cady Co. money as needed to help it avoid bankruptcy and save the corporate assets, and (2) that Dale would proceed to the Bahama Islands area to research, write, and publish books on tourism and flying in the Islands. They expected *536 the first book to be published in 1979, and hoped to generate enough income from this activity to pay the outstanding loan on the Cessna. This new activity was operated under the name P.I.L.O.T Publications. Additionally, BCI travel agency was started. In 1978 petitioner became president of Cady Co., since Dale was going to be away in the Islands. By July 31, 1978, petitioner owned 41.7 percent of the 150 outstanding shares of Cady Co. while Dale owned 58.3 percent. Petitioner prepared all Cady Co.'s U.S. Small Business Corporation Income Tax Returns (Form 1120S) for calendar years 1978 through 1983, including the 1982 and 1983 amended returns. [4] The following information was reported on Cady Co.'s returns, as originally filed: [5]
Business
Product/
Ownership
Gross Net
Year
Activity
Serrvice
(Time Devoted)
Receipts Loss
1978
Real Estate
Homes & Lots
Dale: 58.3%
$ 424,673
$ 102,746
Development
(full-time)
Petitioner: 41.7%
(part-time)
1979
Real Estate
Homes & Lots
Dale: 58.3%
$ 220,400
$  53,413
Development
(full-time)
Petitioner: 41.7%
(part-time)
1980
Publishing
Book
Dale: 58.3%
$ 139,404
$  53,574
Distribution
(full-time)
Petitioner: 41.7%
(part-time)
1981
Publishing
Book
Dale: 58.3%
$  89,886
$  44,596
Distribution
(full-time)
Petitioner: 41.7%
(part-time)
1982
Publishing
Book
Dale: 87 shares
$  71,664
$  55,544 *
Distribution
(full-time; 100%)
Petitioner: 63 sh.
(part-time; 25%)
1983
Inactive-
Dale: 87 shares
--
$  10,832
Pending
Inactive
Petitioner: 63 sh.
Liquidation
*537 On their individual returns (Forms 1040) for 1978, 1980, and 1981 [6] petitioners reported a 41.7-percent share of Cady Co.'s losses. On their 1982 and 1983 returns, petitioners reported a 42-percent share of Cady Co.'s losses. In early 1984 Ms. Green, a revenue agent, was assigned to audit Cady Co.'s 1982 corporate return. The initial interview *538 was November 7, 1984, in petitioners' home on Leroy Stevens Road. As reported on the corporate returns, petitioner told Ms. Green that Cady Co.'s 1982 business activity was publishing, i.e., P.I.L.O.T. and BCI; that in 1983 it divested itself of the publishing business; and that thereafter P.I.L.O.T. and BCI were Dale's sole proprietorships. Nothing petitioner told Ms. Green conflicted with what he had reported on Cady Co.'s original 1982 return concerning stock ownership and its business activities. On or about December 13, 1984, petitioner provided Ms. Green with various documents, including minutes of Cady Co.'s shareholders' meetings held between April 1974 and April 1984. Petitioner stated he typed the minutes from those meetings shortly after they took place. Petitioner did not provide Ms. Green with any documents or corporate minutes relating to taxable year 1982, although he introduced some at trial. The information contained in those corporate minutes was consistent with petitioner's reported ownership interest in Cady Co. and Cady Co.'s reported business activities. However, the documents petitioner introduced at trial contradicted both the information he reported *539 on Cady Co.'s returns and that contained in the documents shown to Ms. Green. Sometime before December 27, 1984, petitioner also showed Ms. Green stock certificates indicating he owned 100 percent of Cady Co. Everything else Ms. Green saw during the audit contradicted that information. On or about December 31, 1984, petitioner amended Cady Co.'s 1982 return, and reported (1) its business activity as "Construction-LIQUIDATION" and its product or service as "IN LIQUIDATION;" (2) that Dale owned 87 shares of stock and devoted 10 percent of his time to the business; (3) that petitioner owned 63 shares of stock and devoted 25 percent of his time to the business; and (4) that gross receipts were zero, cost of goods sold zero, gross rents $ 13,200, and expenses $ 39,131.78; and there was a $ 11,221 gain from the sale of the Piper airplane. Petitioner also typed the following note on the bottom of the amended 1982 return: Prior interest in Pilot Publications terminated November 1982 upon Sale of Cady Development Co., Inc. Lance Aircraft. The foregoing does not reflect Payment by Pilot Publications of $ 6,882.35 to Finalize Payment of Outstanding Aircraft Loan. In fact Aircraft *540 Sale price in Amount of $ 11,221.00 should have been reduced by $ 6,882.35 to $ 4,338.65. Although petitioner had recently shown Ms. Green the stock certificates indicating he owned 100 percent of Cady Co., he reported only a 42- percent interest on the amended corporate return, and a 42-percent share of Cady Co.'s loss on petitioners' amended individual return for taxable year 1982. On March 7, 1986, Cady Co. filed an amended return for 1983 and reported (1) its business activity as "Inactive-pending liquidation" and its product or service as "Inactive"; and (2) that petitioner owned 150 shares, or 100 percent of the corporation. A. Did petitioner own 100 percent of Cady Co. in 1982?
Petitioner alleges that on August 15, 1978, Dale transferred his shares to petitioner, that new stock certificates were issued in petitioner's name, and that he thus owned 100 percent of Cady Co. He explains that when he prepared the corporate returns for 1978 through 1982, including the amended return for 1982, and reported Dale as owning stock in Cady Co., he had forgotten that he owned 100 percent of Cady Co. We conclude petitioner did not own 100 percent of Cady Co. in 1982. *541 First, petitioner stated that he spoke with his attorney during the audit because he was "having trouble with the IRS, * * * with this division," and that Mr. Pipes said "Well, don't you remember, * * * back in '78 I changed the shares over?" He went on to state, "I wrote a little story about it somewhere -- it wasn't corporate minutes." We believe the "little story" petitioner referred to is that contained in a memorandum dated August 15, 1978. That memorandum could not have been written on or around August 15, 1978, if the alleged conversation took place after that date,i.e., in either late 1984 or early 1985. Thus, we find the memorandum and the stock certificates unreliable in proving petitioner owned 100 percent of Cady Co. Second, petitioner prepared Cady Co.'s tax returns for six consecutive years, i.e., 1978 through 1983. On each return he reported that he owned either 41.7 percent or 42 percent of Cady Co. Then sometime before December 27, 1984, petitioner showed Ms. Green the stock certificates that indicated he owned 100 percent of Cady Co. On December 27, 1984, petitioner signed both the amended corporate and individual returns for 1982, and filed them on December 31, 1984, and *542 January 4, 1985, respectively. However, on both returns petitioner reported that he owned 42 percent of Cady Co., rather than 100 percent. We do not believe petitioner could inadvertently report he owned 42 percent for six consecutive years if he actually owned 100 percent, or that petitioner "forgot" he owned 100 percent of Cady Co. between the time he showed the stock certificates to Ms Green and prepared the amended returns. Third, petitioner testified that the annual corporate meetings were generally held during the first week of April, that he typed all notes therefrom, and that he did not change any information on them, either after he typed them, or after Ms. Green completed the audit. However, the evidence indicates that the minutes were changed between audit and trial. According to Ms. Green, whom we found credible, the corporate minutes dated April 4, 1978, indicated that petitioner owned 62- 1/2 shares and Dale owned 87-1/2 shares. On the other hand, the memorandum petitioner introduced at trial purportedly dated April 4, 1978, states that petitioner owned 50 shares and Dale owned 100 shares. Ms. Green's notes on the minutes dated April 1, 1983, indicated that petitioner *543 owned 63 shares and Dale owned 87 shares. However, the memorandum petitioner introduced dated April 1, 1983, states in relevant part the following: Shareholder- Richard A. Cady - Owner of all 150 Outstanding Shares. Meeting Attended by: Richard A. Cady, Dale R.A. Cady, VP, and H. B. Cady, Secretary. As records reflect, home development terminated in August 1978 at which time Richard A. Cady obtained all outstanding CDC Shares in return for cancellation of outstanding note for his original shares. * * * Again, it would be reasonable for petitioner to reflect his interest as 42 percent in the corporate minutes, as Ms. Green noted, and on the corporate and petitioners' individual returns as was actually done, if petitioner had honestly forgotten that he owned 100 percent of Cady Co. However, the corporate minutes and other memoranda petitioner introduced at trial all indicate he owned 100 percent. It is unbelievable that petitioner could prepare the corporate returns in March of each year reporting a 41.7 or 42 percent interest; prepare the corporate minutes for April 4, 1978, April 3, 1979, April 4, 1982, and April 3, 1983, indicating he owned 100 percent of Cady Co. *544 ; and then, by April 15 of each year, file the individual returns again reporting that he owned either 41.3 or 42 percent. [7]
Based on the foregoing, we can only conclude that either petitioner owned 100 percent of Cady Co. from 1978 through 1982 and filed false tax returns when he claimed he owned only 42 percent, or that he owned 42 percent during those years and altered the documents he introduced in this Court. We believe the latter is more accurate and find the documents petitioner introduced on this issue unreliable. We thus conclude petitioner owned 42 percent, rather than 100 percent of Cady Co. during 1982. B. Did Cady Co.'s activities include P.I.L.O.T. and BCI?
Petitioner alleges that Cady Co. never had any interest in P.I.L.O.T. or BCI because they were at all times Dale's sole proprietorships. Respondent contends that during 1982 Cady *545 Co.'s activities included P.I.L.O.T. and BCI. We agree with respondent. Moreover, the corporate minutes petitioner provided Ms. Green, dated April 2, 1981, [8] and April 1, 1983, [9] support the fact that P.I.L.O.T. was part of Cady Co. during 1982, and until 1983. At trial petitioner introduced various memoranda, *546 in particular one dated April 4, 1978, to support his claim that P.I.L.O.T. and BCI were not affiliated with Cady Co. However, that document differs from the April 4, 1978, document petitioner showed Ms. Green during the audit. Thus, without additional evidence corroborating the information contained in petitioner's documents, we find them unreliable. Petitioner also alleges that Dale, on behalf of his sole proprietorship P.I.L.O.T., chartered the Lance Piper airplane on August 17, 1978, [10] and that P.I.L.O.T. agreed to make the mortgage payments on the airplane. We do not agree. If Dale chartered the Lance Piper airplane on behalf of P.I.L.O.T., as petitioner claims, Cady Co. would have additional income in amount equal to the mortgage payments Dale made during the term of the charter. However, the evidence shows that Cady *547 Co. and petitioner treated the mortgage payments as advances from either petitioner or Dale, rather than income. Lastly, petitioner stated, "The company did no business whatsoever from the time that I took it over. All it did was lease an office building for $ 13,200 a year - - had no other income whatsoever." However, petitioner reported income and claimed deductions relating to P.I.L.O.T. and BCI, in addition to the $ 13,200 rental income on Cady Co.'s 1980, 1981, and 1982 Forms 1120S. Petitioner even made a notation on the amended 1982 Form 1120S indicating that Cady Co. had an interest in P.I.L.O.T until November 1982. We conclude that P.I.L.O.T. and BCI were part of Cady Co.'s business activities during 1982. C. Gain of $ 44,356 on the sale of the airplane. In August 1977 Cady Co. purchased a Lance Piper airplane for $ 68,070. From 1977 through 1981 Cady Co. claimed $ 47,020 in depreciation. Thus, as of January 1, 1982, the depreciable basis remaining was $ 21,050. In October 1982 the airplane lost an engine and was damaged by fire. Dale had it repaired at a cost of $ 6,779, but nevertheless decided it was unsafe for flying back and forth to the Bahamas. However, *548 he needed a plane to continue research for the books. Dale contacted a Bill Walker, who was willing to sell a Cessna 414 in return for the Lance Piper, free of the $ 6,882.35 outstanding liability, plus $ 43,000 in cash. On or around November 20, 1982, Dale made a $ 1,000 deposit on the Cessna, and on November 24, 1982, petitioner withdrew $ 30,000 from his Prudential-Bache account and obtained a cashier's check payable to "Bill Walker." Cady Co. listed $ 99,500 as the Cessna 414's cost on its depreciation schedule for 1982. Throughout 1982 Dale, on behalf of Cady Co., maintained travel, maintenance and expense logs on the airplanes. Petitioner alleges that on or about November 18, 1982, he and Dale entered into an agreement whereby Cady Co. would sell and transfer title of the Piper Lance airplane to Dale, in consideration for Dale's (1) reducing his capital investment in Cady Co. by $ 11,221; (2) making the prior mortgage payments on the ITT loan; and (3) relieving Cady Co. of its obligation to pay the remaining ITT loan balance of approximately $ 6,900. Additionally, petitioner alleges that on or about November 29, 1982, they completed the transfer. Cady Co. thus realized *549 a gain of $ 11,221. Respondent contends that Cady Co., rather than Dale individually, purchased the Cessna 414. We agree with respondent. Petitioner introduced memoranda dated November 7, 1982, November 18, 1982, and November 29, 1982. They in essence state that Cady Co. did not buy the Cessna, but rather sold the Lance airplane to Dale who in turn purchased the Cessna for his sole proprietorship P.I.L.O.T. None of those memoranda were shown to Ms. Green at any time during or after the audit. According to the corporate minutes she saw dated April 1, 1983, Cady Co., rather than Dale, purchased the Cessna. Her notes taken from those minutes state in relevant part: "Cessna 414 purchased by a personal loan from R. A. Cady. Lance Aircraft was accepted as collateral by owners of replacement aircraft. BV: $ 11,221.00." Her notes also contain this verbatim excerpt from the corporate minutes: With a view to liquidation of CDC, and reduction of outstanding loans, it has been mutually agreed at this time, to transfer to Dale R. A. Cady all CDC interest in the Cessna 414 Aircraft as well as CDC interest in Pilot Publications, for which Dale R. A. Cady agreed to cancel his *550 outstanding demand loan to CDC in the amount of $ 131,420.94. This agreement results in reduction of CDC assets in amount of approximately $ 128,000 which is mutually agreed to be a fair and equitable arrangement. We find petitioner's evidence unpersuasive, and conclude that Cady Co., rather than Dale, purchased the Cessna. We must next decide the amount of gain Cady Co. realized from the Lance Piper's disposition. Petitioner testified that the purchase price of the Cessna was $ 75,000, i.e., $ 32,000 trade-in value on the Lance Piper airplane, plus $ 43,000 cash, and that Dale expended approximately $ 28,000 in addition to get the Cessna operational. Accordingly, the $ 99,500 "cost" listed on the depreciation schedule includes the expenditures to rehabilitate the airplane, and should not be considered in computing the gain from the sale of the Lance Piper. Respondent contends that the Cessna's purchase price was $ 99,500, i.e., paid $ 43,000 cash plus $ 56,500 trade-in value on the Lance Piper airplane. Respondent also contends that the airplane's adjusted basis was $ 12,144.23 as of the date it was traded in for the Cessna. We agree with respondent. During the audit *551 petitioner gave Ms. Green a file containing an invoice on the Cessna 414 reflecting a purchase price of $ 99,500. Petitioner did not prove a purchase price other than $ 99,500. Thus, we find the Cessna's purchase price was $ 99,500. Although $ 6,779 of repairs were made on the Lance Piper before it was traded in, these expenditures are not improvements and, therefore, are not capitalized. See sec. 1016; sec. 212; Illinois Merchants Trust Co. v. Commissioner, 4 B.T.A. 103 (1926). Thus, the basis of the Lance Piper airplane remains $ 12,144.23. Moreover, there is no evidence, not even the airplane expense log Dale maintained, that any capital expenditures weremade to the Cessna in 1982. We conclude Cady Co. realized a $ 44,356 ordinary section 1245 gain on the disposition of the Lance Piper airplane. D. Gross receipts. During 1982 petitioner advanced Cady Co. $ 12,563.56 as follows: (1) he transferred a total of $ 8,100 from Marine Press to Cady Co.'s account; (2) he deposited two checks to Cady Co.'s account totaling $ 2,706.66 payable to "R. A. Cady Marine Survey Practice" from American Foreign Steamship Corporation; (3) he wrote four checks totaling *552 $ 2,519.92 to pay Cady Co.'s taxes. Petitioner included $ 1,756.95 of the $ 2,519.92 to arrive at the total amount he claims was loaned to Cady Co., i.e., $ 12,563.56. The remaining $ 762.97, $ 763 when rounded, was deducted (and disallowed) as a business expense of Marine Press. Additionally, P.I.L.O.T transferred $ 6,000 from its separate account to Cady Co.'s account. Respondent contends that petitioner failed to prove that deposits totaling $ 15,850 and $ 13,849.96, made to P.I.L.O.T.'s and Cady Co.'s accounts, respectively, were from nontaxable sources. Bank deposits are prima facie evidence of income, and petitioners must show that the funds deposited were not received from a taxable source. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). We find the $ 13,849.96 deposited to Cady Co.'s account came from nontaxable sources as follows: (1) $ 1,467.61 represents a loan from petitioner and Marine Press; (2) $ 4,000 is a loan from Dale; (3) $ 1,500 is an "intracorporate" transfer from P.I.L.O.T (check no. 1890); and (4) $ 6,882.35 is a contribution to the capital *553 of Cady Co. from petitioner or Dale, and represents the final payment of the Lance Piper airplane. Additionally, we find the $ 4,000 deposited into P.I.L.O.T.'s account is the same $ 4,000 that was loaned to Cady Co. and, therefore, represents a nontaxable source, i.e., an "intracorporate" transfer from Cady Co. to P.I.L.O.T. Based on the foregoing, Cady Co. underreported its gross receipts by $ 11,850, rather than $ 29,699.96. E. Business deductions. 1. Rent - 5068 Kings Row property. Sometime before April 1, 1980, Dale purchased a 3 bedroom, 2 bath house at 5068 Kings Row, (Castlewood) Mobile, Ala. The house had approximately 1,500 square feet of living area and a two car garage. At all times during 1982 Honey Cady, petitioner's former daughter-in-law, and Danielle Cady, petitioners' granddaughter, resided at the address. Dale occasionally stayed there during 1982. By 1982 Cady Co. had moved its business office from its 8100 Cottage Hill Road building to 5068 Kings Row, and was renting the 8100 Cottage Hill Road office building to a third party. Cady Co. used one bedroom (10 by 12 foot area) to conduct BCI's and P.I.L.O.T.'s business, and approximately *554 one-third (10 by 20 foot area) of the garage for storing P.I.L.O.T.'s unsold books. Cady Co. agreed to pay the monthly mortgage on the residence in return for the lease. Cady Co. deducted $ 5,126.24 as rental expense on its 1982 Form 1120S. Respondent allowed $ 1,200. Petitioner contends that the fair rental value of the property was $ 650 per month, and that Cady Co. used one-half of the house for business purposes. Respondent contends that the fair rental value of the 120-square-foot bedroom is $ 53 per month, while the fair rental value of the garage (storage unit) is $ 47 per month. Petitioner's only evidence on this issue was his testimony and a typewritten statement he prepared. Petitioner failed to carry his burden of proof, and we hold for respondent. 2. Depreciation
Cady Co. claimed depreciation of $ 16,725. Respondent allowed $ 14,084. [11] We find $ 29,009 the correct amount. a. *555 Cottage Hill Road building
Respondent determined that petitioner changed Cady Co.'s method for calculating depreciation without consent, and determined $ 2,515.17 as the correct depreciation allowed for 1982. Petitioner did not present any evidence on this issue. Accordingly, we hold for respondent. b. Airplane
Cady Co. claimed 12 months of depreciation ($ 9,729) on the Lance Piper for taxable year 1982. Respondent determined that Cady Co. was entitled to claim 11 months ($ 8,906), rather than 12. We agree with respondent. However, Cady Co. is permitted an additional $ 14,925 in depreciation on the Cessna airplane, since it was placed in service in 1982. See Sec. 168. 3. Aircraft expenses
On October 23, 1982, the airplane lost an engine and was damaged by fire. By October 30, 1982, $ 4,433.81 had been expensed to repair the damaged airplane. Then, on or around November 20, 1982, an additional $ 2,345.27 was expended. Cady Co. claimed a $ 13,147 deduction in aircraft expenses. Respondent allowed $ 11,861.13, which included the $ 4,433.11 expenditure. Petitioner established that $ 2,345.27 additional repairs were made on the Lance Piper on or around November 20, 1982. *556 Accordingly, the correct amount of the deduction is $ 14,206.40. 4. Insurance
Cady Co. deducted $ 5,739.59 in insurance expenses in 1982. Respondent allowed $ 3,426.10, and disallowed the remainder on the basis that petitioner failed to show that Dale's health or life insurance was an ordinary and necessary business expense of Cady Co. We agree. Additionally, we found that Cady Co. owned the Cessna, even if it was titled in Dale's name, and that the $ 2,200 insurance premium Marine Press paid on December 6, 1982, to insure the Cessna 414 was a capital contribution to Cady Co. Respondent did not allow either Marine Press or Cady Co. to deduct that expense. Thus, Cady Co. is entitled to an additional $ 2,200 deduction. Deputy v. du Pont, 308 U.S. at 494; Rink v. Commissioner, 51 T.C. 746, 751 (1969). 5. Taxes
Respondent did not disallow any of the amount Cady Co. deducted for taxes. However, the parties agreed that Marine Press paid $ 763 of Cady Co.'s taxes in 1982, and we found that Cady Co. received a $ 763 capital contribution. Thus, it is entitled to an additional $ 763 deduction. Deputy v. du Pont, supra; *557 Rink v. Commissioner, supra.
6. Repairs
We found that $ 166.14 of the repair expenses petitioner deducted from Marine Press was a capital contribution to Cady Co. Accordingly, Cady Co. is entitled to deduct this amount in addition to the $ 325 respondent allowed. 7. All other expenses (Advertising, automobile, business travel, and postage). Petitioner failed to present any evidence substantiating that Cady Co. was entitled to a deduction greater than respondent determined. In fact petitioner asserted that Cady Co. did not incur any expenses for advertising, business travel, automobile, or postage, since those expenses were incurred by P.I.L.O.T., and Cady Co. was not affiliated with P.I.L.O.T. Accordingly, we hold for respondent on these adjustments. Based on the foregoing, we conclude that petitioner's 42-percent share of undistributed taxable income is $ 8,879.27. See Appendix B. 3. Self-employment tax and Additions to tax
The facts relating to these issues have been sufficiently set forth above. Therefore, we will not reiterate them here. Self-Employment Taxes
Petitioner was self-employed (Marine Press), failed to report *558 all income therefrom, and overstated the business deductions. Accordingly, petitioners are subject to self-employment tax. Section 6653(a)(1) and (2)
The issue for decision is whether petitioners are liable for the additions to tax under section 6653(a)(1) and (2). Negligence is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985), quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967). Petitioners bear the burden of proof on this issue. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Rule 142(a). Respondent determined that the underpayment of petitioners' 1982 income tax, with the exception of that portion of the underpayment attributable to petitioner's failure to report his share of the gain realized on the sale of the Lance Piper airplane, was due to negligence. Additionally, he contends that petitioners deducted personal expenses as business expenses, failed to keep adequate business *559 records that substantiated the claimed deductions, and finally, that petitioner altered various documents. Petitioner did not present any convincing evidence on this issue. We agree with respondent, and conclude that petitioners are liable for the additions to tax, in an amount to be determined after taking into consideration the adjustments made herein. Section 6661
The final issue for decision is whether petitioners are liable for the addition to tax under section 6661(a) for substantially understating their income tax for 1982. Respondent determined that there was a substantial understatement of income tax for 1982, and that petitioners were liable for a 10-percent addition to tax. However, in an amended answer respondent increased the rate of the addition to tax to 25 percent to reflect the amendment of section 6661(a) by section 8002(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, effective for additions to tax assessed after October 21, 1986. Any addition to tax under section 6661(a) applicable to this case will be assessed after October 21, 1986, and, therefore, the 25-percent rate applies. *560 An understatement of tax is the excess of the amount of tax required to be shown on the return over the amount of tax shown on the return. Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of $ 5,000, or 10 percent of the amount required to be shown on the return. Sec. 6661(b)(1)(A). Petitioners neither offered "substantial authority" for their understatement, nor did they "adequately disclose" any facts affecting the tax treatment of the items in issue as provided by section 6661(b)(2)(B)(i) and (ii). Accordingly, petitioners substantially understated their income tax, thus they are liable for the section 6661(a) addition at the 25-percent rate. To reflect the foregoing, Decision will be entered under Rule 155. APPENDIX A Marine Press had the following income, cost of goods sold, and deductions in 1982: INCOME
(1) Gross receipts
$ 26,182
(2) Cost of goods sold
4,790
TOTAL GROSS PROFIT
$ 21,392
DEDUCTIONS
(1) Advertising
$   179.00
(2) Bank service charge
158.00
(3) Car and truck expenses
615.64
(4) Freight
1,402.40
(5) Insurance
132.00
(6) Office supplies
193.00
(7) Depreciation
*  (8) Repairs
789.00
(9) Taxes
-0-
(10) Travel and entertainment
** 2,943.05
(11) Utilities
555.00
Telephone
-0- (12) Miscellaneous
*** 112.00
*561 APPENDIX B Cady Co. had the following income and deductions in 1982: INCOME
(1) Gross Receipts
$  83,513.85
(2) Cost of goods sold:
12,926.00
(3) Gross profit
70,587.85
(4) Gross rents
13,200.00
Total income without
regard to Sale of Airplane
$  83,787.85
(5) Other income: Sale of Airplane
44,356.00
TOTAL INCOME
$ 128,143.85
DEDUCTIONS
(1) Repairs
$     491.14
(2) Rents
1,200.00
(3) Taxes
2,592.30
(4) Interest
(a) ITT
1,608.39
(b) First Nat'l.
(Office bdlg.)
7,231.55
8,839.94
(5) Depreciation
29,009.00
(6) Advertising
8,185.59
(7) Other deductions:
(a) Aircraft expense
14,206.40
(b) Auto expense
21.95
(c) Business travel
24,250.57
(d) Commissions on sales
1,404.96
(e) Postage and freight
3,865.58
(f) Insurance
5,626.10
(g) Office supplies
547.32
(h) Bank charges
970.78
(i) Telephone
3,526.88
(j) Utilities
1,973.11
(k) Miscellaneous
291.85
$  56,684.76
TOTAL DEDUCTIONS
$ 107,002.73
TOTAL TAXABLE INCOME
$ 21,141.12
*562 Footnotes
*. 50 percent of the interest due on $ 17,557.00.↩
1. Petitioner reported Marine Press' gross receipts as $ 26,182, cost of goods sold as $ 5,246, and expenses as $ 21,092. Petitioner added the deductions incorrectly, and therefore, reported total deductions of $ 20,933, and a $ 3 gain on the amended individual return. Additionally, he increased the insurance expenses by $ 2,000, and the repair expense by $ 1,000.↩
2. The $ 4,790 amount is computed by taking the total purchases ($ 21,564) and subtracting the $ 15,104 respondent determined petitioner deducted between 1977 and 1981. The result is a January 1, 1982, beginning inventory of $ 6,460. Then using either petitioners' claimed ending inventory for 1982 ($ 1,670), or respondent's method, i.e., taking the 1983 return information of ending inventory ($ 382), and the cost of goods sold deduction ($ 1,288), we arrive at $ 4,790.↩
3. Petitioner incurred $ 179 for advertising. Respondent agreed with the total amount, but reclassified it under "Miscellaneous" ($ 89), and "Travel and Entertainment" ($ 90).↩
4. All corporate returns were filed in early March of the succeeding taxable year. Petitioner also prepared Dale's and petitioners' individual returns at all relevant times.↩
5. Some of the gross receipt and net loss figures are rounded for convenience.↩
*. Represents cost of goods sold of $ 12,926; gross rents of $ 13,200; and expenses of $ 127,482. All gross receipts and most of the expenses are attributable to P.I.L.O.T. and BCI.↩
6. Petitioners' 1979 return was not in evidence.↩
7. Petitioners signed their joint 1982 Federal return on April 10, 1983. The corporate minutes petitioner introduced at trial were dated April 1, 1983.↩
8. Ms. Green copied the following excerpt from the corporate minutes, dated April 2, 1981, petitioner provided to her in December 1984: In view of custom limitation of $ 5000.00 cash for citizens leaving the U.S.A. it becomes very difficult to maintain necessary funds for payment of services in the Caribbean [sic] area where generally checks and credit cards are not accepted. Currently we have arrangements for a Bahama Inn to maintain surplus personal funds which may be drawn at our convenience to pay for necessary expenses requiring cash payment. Without this arrangement our operation could not function. ↩
9. For the excerpt taken from the April 1, 1983, minutes see infra 2. Cady↩, C.
10. Petitioner introduced a memorandum titled "CHARTER/PURCHASE AGREEMENT" dated August 17, 1978. He did not however, show it to Ms. Green at any time during, or after the audit.↩
11. The $ 14,084 includes the $ 2,515.17 and $ 8,906 amounts discussed in subheadings 2a. and b.↩
*. To be calculated in the Rule 155 computation.↩
**. This amount reflects the $ 90 reduction we reclassified as an advertising expense.↩
***. This amount reflects the $ 89 reduction we reclassified as an advertising expense.↩